**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **SHAHAB DALILI, NAHID KHAZAI, DARIAN DALILI, DAMON DALILI** | : | |
| **Plaintiffs** | : | |
| **v.** | : | **Case No: 26-2956-TBD** |
| **THE GOVERNMENT OF THE ISLAMIC REPUBLIC OF IRAN, incl. its ministries, agencies, and instrumentalities** | : | |
| **Defendant(s)** | : | |

# COMPLAINT

**COMES NOW**, Plaintiffs, SHAHAB DALILI, NAHID KHAZAI, DARIAN DALILI, DAMON DALILI, by and through undersigned counsel, and bring this action against the Government of the Islamic Republic of Iran, including its ministries, agencies, and instrumentalities ("Iran"), pursuant to 28 U.S.C. § 1605A. Plaintiffs seek redress for Iran's wrongful acts, including the arbitrary arrest, torture, prolonged unlawful detention, and hostage-taking of Mr. Shahab Dalili, all of which were carried out by Iranian officials, agents, and instrumentalities acting under color of foreign state authority.

## PARTIES, VENUE, AND JURISDICTION

1. Mr. Shahab Dalili ("Mr. Dalili") was, at all relevant times, a lawful permanent resident of the United States, residing in Virginia. Mr. Dalili was arbitrarily arrested, forcibly detained, held incommunicado, tortured, and unlawfully imprisoned for more than ten years by

the Government of the Islamic Republic of Iran, acting through its ministries, agencies, officials, and instrumentalities (collectively referred to herein as "Iran").

2. Plaintiff, Mr. Dalili, brings this action in his individual capacity pursuant to 28 U.S.C. § 1605A(c) to recover all damages recoverable under federal law for the personal injuries, pain and suffering, torture, and hostage-taking inflicted upon him by the Islamic Republic of Iran and its officials, employees, agents, and instrumentalities acting within the scope of their authority. At all relevant times, Mr. Dalili was a lawful permanent resident of the United States of America who owed permanent allegiance to the United States.

3. Plaintiff, Nahid Khazai, is the spouse of Shahab Dalili. She is a United States citizen and otherwise *sui juris*. She brings this action in her individual capacity pursuant to 28 U.S.C. § 1605A(c) for all damages recoverable under federal law, including solatium, emotional distress, loss of consortium, punitive damages, and all other injuries proximately caused by Iran's torture and hostage-taking of her husband.

4. Plaintiff, Darian Dalili, is the elder son of Shahab Dalili. He is a United States citizen and otherwise *sui juris*. In his individual capacity, he brings this action pursuant to 28 U.S.C. § 1605A(c) for all damages recoverable under federal law, including solatium, emotional distress, loss of guidance, loss of companionship, punitive damages, and all other injuries proximately caused by Iran's torture and hostage-taking of his father.

5. Plaintiff, Damon Dalili, is the younger son of Shahab Dalili. He is a United States citizen and otherwise *sui juris*. In his individual capacity, he brings this action pursuant to 28 U.S.C. § 1605A(c) to recover all damages permitted under federal law, including solatium, emotional distress, loss of guidance, loss of companionship, punitive damages, and all other injuries proximately caused by Iran's torture and hostage-taking of his father.

6. Defendant, the Islamic Republic of Iran ("Iran"), is a foreign state within the meaning of 28 U.S.C. § 1603(a). Iran has been designated by the United States as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 and has remained so designated at all times relevant to this action.

7. At all relevant times, Iran acted through, and is in full control of, its ministries, agencies, and instrumentalities, including the Ministry of Intelligence and Security ("MOIS"), the Islamic Revolutionary Guard Corps ("IRGC"), and its judicial, intelligence, and prison officials who planned, authorized, directed, and carried out the arrest, torture, hostage-taking, and prolonged unlawful detention of Mr. Dalili. Iran is vicariously liable for the acts of its officials, employees, and agents pursuant to 28 U.S.C. § 1605A(c)(4).

8. Plaintiffs jointly plead and seek an award of punitive damages against the Islamic Republic of Iran pursuant to 28 U.S.C. § 1605A(c), based on Iran's willful, intentional, malicious, and egregious conduct, including the arbitrary arrest, torture, hostage-taking, and prolonged unlawful detention of Mr. Dalili and caused the damages listed herein. Punitive damages are warranted to punish Iran for its deliberate violations of international and United States law and to deter Iran and other state sponsors of terrorism from engaging in similar conduct in the future.

9. To the extent required by 28 U.S.C. § 1605A(a)(2)(A)(iii), Iran has been afforded a reasonable opportunity to arbitrate this claim. In the alternative, to the extent the Court concludes that any "act" described in 28 U.S.C. § 1605A(a)(1) occurred within Iran for purposes of § 1605A(a)(2)(A)(iii), Plaintiffs allege that Iran has consistently and categorically refused to engage in arbitration or any other neutral dispute-resolution mechanism to address claims arising from the wrongful detention, torture, and hostage-taking of a United States national. Iran has

rejected comparable claims, declined diplomatic or arbitral engagement in similar matters, and made clear that any request for arbitration in this case would have been futile.

10. Notwithstanding the foregoing, and without waiving any jurisdictional arguments or rights under the Foreign Sovereign Immunities Act, Plaintiffs remain ready, willing, and able to arbitrate this dispute. Iran may initiate arbitration at any time by contacting the undersigned counsel to coordinate an arbitral forum and procedure, or by filing a notice of appearance and an unopposed motion requesting that this matter be referred to arbitration.

11. Accordingly, all applicable statutory prerequisites, jurisdictional conditions, and preconditions to suit under 28 U.S.C. § 1605A have been satisfied, occurred, been excused, or been waived.

12. The acts and conduct complained of herein fall squarely within the terrorism exception to sovereign immunity set forth in 28 U.S.C. § 1605A and therefore are not protected by the Foreign Sovereign Immunities Act, as they involve acts of torture and hostage-taking committed by a designated state sponsor of terrorism.

13. At all relevant times, Mr. Dalili was a lawful permanent resident of the United States and owed permanent allegiance to the United States within the meaning of 8 U.S.C. § 1101(a)(22).

14. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1330(a) and personal jurisdiction pursuant to 28 U.S.C. § 1330(b), because this action falls within the terrorism exception to sovereign immunity set forth in 28 U.S.C. § 1605A and service will be effected in accordance with 28 U.S.C. § 1608.

15. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(f)(4) because this action is brought against a foreign state and its agencies and instrumentalities. This action arises

from the Islamic Republic of Iran's arbitrary arrest, prolonged incommunicado detention, torture, and hostage-taking of Shahab Dalili, who had built a life with his family in Virginia. Acting through its intelligence services, security forces, prison officials, and judicial authorities, Iran seized Mr. Dalili as he prepared to leave the country, forcibly disappeared him, subjected him to ten years of physical and psychological abuse, denied him counsel of choice and due process, and exploited his detention as an instrument of leverage—holding him for more than a decade before releasing him in May 2026. This action seeks accountability under federal law for Iran's coordinated campaign of state-sponsored coercion.

## BACKGROUND

16. Mr. Dalili enjoyed a long and distinguished career at sea, retiring as a merchant ship captain. He had served as a captain with the Islamic Republic of Iran Shipping Lines ("IRISL"), a shipping enterprise that was privatized approximately a decade before his retirement, where his responsibilities were limited to fleet safety, security certification, and day-to-day operations. He never held a position involving access to state secrets, confidential information, or politically sensitive material.

17. Approximately twenty months before his arrest, Mr. Dalili immigrated to the United States with his wife and two sons, settling in Virginia and obtaining lawful permanent residency. The family had recently purchased and moved into a new home in Gainesville, Virginia.

18. On March 20, 2016, Mr. Dalili's father passed away in Iran. Because of intervening obligations associated with the family's move and the Iranian New Year holidays,

Mr. Dalili was unable to travel immediately, and he flew to Tehran on or about April 3, 2016, intending to remain abroad for only about one week to attend the funeral.

19. On or about the night of April 10, 2016, Mr. Dalili left his mother-in-law's residence in Tehran by airport taxi to return to the United States. Minutes after leaving, his taxi was stopped by armed men, and he was forced into another vehicle and taken into custody by Islamic regime agents armed with weapons. He would later learn that these men were working for the Iranian Ministry of Intelligence.

20. Mr. Dalili was eventually shown a purported arrest warrant by the men detaining him, but it provided no indication of any reason for his arrest. These men asked him a series of questions, including whether he had any "enemies." These men acknowledged that they had surveilled him throughout his stay in Tehran and observed no wrongdoing. Mr. Dalili describes how the entire detention process had him in a state of shock.

21. Mr. Dalili was driven to Evin Prison, blindfolded, stripped of his belongings—including his passport, Green Card, and identification—and placed in a cell of less than fifty square feet, with no toilet, no bed, and only rough blankets to sleep on the floor. For several days, his family did not know where he was.

22. Mr. Dalili was seized hours before he was scheduled to board a flight home to the United States. His wife, expecting his return, traveled to Washington Dulles International Airport to meet a flight he would never board. For several days after his disappearance, neither his family in the United States nor his relatives in Iran knew his whereabouts or whether he was alive; Iran provided no notice of his arrest, no charge, and no acknowledgment that he was in its custody.

23. Mr. Dalili was held in prolonged solitary confinement within Evin Prison's Ward 209 and subjected to repeated interrogations. He was forced to wear a blindfold whenever he was moved, made to face a wall during questioning, and never informed of the charges or shown any evidence against him; instead, interrogators demanded that he explain why he himself had been arrested. He was denied access to counsel and to his family until he "cooperated" to the satisfaction of the interrogation team.

24. The conditions of Mr. Dalili's confinement were inhumane: he was confined to small, filthy foot cells, rarely allowed to sleep, and if he did, he slept on the floor. He was permitted to bathe only once a week, was denied adequate clothing and nutrition, and was subjected to constant uncertainty and psychological pressure designed to break his will. He was held in a state of legal limbo for nearly two years before he was sentenced.

25. Iranian authorities initially accused Mr. Dalili of "espionage" under Article 501 of the Iranian Penal Code, an allegation that was facially baseless given that Mr. Dalili had worked for a privatized shipping company and had never accessed any state secrets. Mr. Dalili's case was handled by Ghanaatkar, a security official close to the Ministry of Intelligence and the Islamic Revolutionary Guard Corps ("IRGC") who had issued his arrest warrant, and who later became the head of the Evin judiciary complex.

26. Before any trial had been held or any sentence imposed, an official who identified himself as the head of the legal office of the Ministry of Intelligence informed Mr. Dalili that the confiscated currency would be retained against sums he would be "sentenced to pay." The Ministry of Intelligence had already fixed a financial penalty for a conviction not yet obtained, in proceedings not yet held, confirming that Mr. Dalili's prosecution was a foregone conclusion orchestrated by Iran's intelligence services rather than any genuine adjudication of charges.

27. Iran's own conduct confirmed that it knew Mr. Dalili had committed no offense. The agents who seized him acknowledged that they had surveilled him throughout his visit to Tehran and had observed no wrongdoing. During his interrogation, apparently unwilling to accept that he was concealing nothing, Iranian interrogators administered a polygraph examination; Mr. Dalili submitted to it, his interrogators were visibly satisfied with the result, and active interrogation ceased shortly afterward. Notwithstanding surveillance that revealed no wrongdoing and a polygraph examination credited by his own interrogators, Iran proceeded to prosecute, convict, and imprison Mr. Dalili for ten years. These facts establish that Iran detained Mr. Dalili for reasons wholly unrelated to any legitimate law-enforcement or penological purpose.

28. Mr. Dalili's case was assigned to Branch 15 of the Tehran Revolutionary Court, presided over by Judge Abolqasem Salavati, a judicial official notorious for imposing harsh sentences in politically motivated cases involving dual nationals, foreign residents, and dissidents. Upon meeting Mr. Dalili, Judge Salavati declared, "You are surely a spy, and you do look just like a spy." Salavati is known as the "hangman judge" because he has presiding over numerous sham trials, handing down harsh prison sentences, and ordering frequent executions against political dissidents, journalists, and human rights activists.

29. The proceedings against Mr. Dalili lacked the basic judicial guarantees recognized as indispensable by civilized peoples. Mr. Dalili's attorney was permitted only limited and obstructed access to the dossier, was excluded from the indictment meeting, and was relegated to a chair several feet away from his client during the trial, while the prosecutor sat directly beside the judge and functioned as the judge's aide. When defense counsel demonstrated that Article 501 was inapplicable because IRISL had been privatized and was unconnected to the

government, Judge Salavati abruptly changed the charge mid-trial to Article 508—contact with a "hostile state"—and dismissed counsel's objections, asserting that he alone could decide and that he possessed authority directly from the Supreme Leader to convict "spies" to the highest terms "without any mercy."

30. Following these sham proceedings, Iranian authorities sentenced Mr. Dalili to ten years' imprisonment on charges of "cooperation with a hostile government," referring to the United States. Mr. Dalili served the entirety of that ten-year sentence. He was thereafter held in Evin Prison, including among the wards reserved for those labeled "spies."

31. Iran used Mr. Dalili's continued detention as an instrument of "hostage diplomacy" and arbitrary detention, holding him for leverage rather than for any legitimate penological purpose. Mr. Dalili's case drew international attention during a 2023 prisoner exchange between Iran and the United States that secured the release of five detained Americans.

32. Mr. Dalili's prolonged disappearance and detention inflicted profound and ongoing harm on his family. His wife was left to manage the household, finances, and obligations he had previously handled, without warning or preparation; his elder son, Darian, then approximately twenty-one years old, was deprived of his father's financial and emotional support during college; and his younger son, Damon, then approximately fifteen, was deprived of his father during a formative period of his adolescence. For more than a decade, the family endured fear, uncertainty, and separation, and could communicate with Mr. Dalili only through limited, monitored, and irregular telephone calls.

33. Mr. Dalili was released and returned to the United States after a long journey from Evin Prison to Yerevan and then to Washington, D.C., reuniting with his family on or about May 19, 2026, after more than ten years of wrongful detention in Iran.

34. Iran arrested, detained, and tortured Mr. Dalili, and held him as a hostage, as part of its deliberate state policy of seizing foreign nationals and foreign residents for purposes of coercion and political leverage. Iran fabricated allegations of espionage and "cooperation with a hostile government," extracted his cooperation through prolonged isolation and coercion, and used his continued captivity as a bargaining asset in its dealings with the United States.

35. Congress enacted the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A, to provide United States nationals and their families a civil remedy against foreign states designated as state sponsors of terrorism for acts of torture, extrajudicial killing, and hostage-taking committed under color of foreign law.

36. Section 1605A abrogates sovereign immunity and creates a federal cause of action where the Defendant is a designated state sponsor of terrorism, the Plaintiff claimant or victim is a national of the United States (or other qualifying person), and the injury was caused by an act of torture, extrajudicial killing, or hostage-taking, or by the provision of material support or resources for such acts.

37. At all times relevant to this action, the Islamic Republic of Iran was designated by the United States Department of State as a state sponsor of terrorism pursuant to § 6(j) of the Export Administration Act of 1979 and has remained continuously so designated since January 19, 1984.

38. Section 1605A(c) expressly authorizes a private cause of action for personal injury caused by acts described in § 1605A(a)(1), including torture and hostage-taking, committed by a foreign state or by an official, employee, or agent of that foreign state acting within the scope of their authority. In any such action, the statute authorizes recovery of

economic damages, based on solatium, pain and suffering, and punitive damages, and provides that the foreign state shall be vicariously liable for the acts of its officials, employees, or agents.

39. The definitions of "torture" and "hostage-taking" incorporated into § 1605A derive from the Torture Victim Protection Act and binding international conventions, and encompass prolonged incommunicado detention, severe physical and psychological abuse, coercion of third parties through threats or detention, and the denial of fundamental judicial guarantees.

40. As alleged in detail above, Iran's conduct toward Shahab Dalili—including his arbitrary arrest; prolonged incommunicado detention and solitary confinement in a cramped cell; being forced to sleep on the floor; being permitted to bathe no more than once a week, if at all; deprivation of adequate nutrition, hygiene, medical care, and other basic necessities; intentional infliction of severe physical and psychological pain and suffering; denial of counsel of his choice and fundamental due process; coercive interrogation; sham judicial proceedings; and use of his continued detention as leverage to compel the United States to take or refrain from taking governmental action—constitutes acts of torture and hostage-taking within the meaning of 28 U.S.C. § 1605A.

41. These acts were carried out by officials, employees, and agents of the Islamic Republic of Iran acting under color of foreign law and within the scope of their authority, rendering Iran directly and vicariously liable under § 1605A(c).

42. Iran's conduct caused severe personal injury to Mr. Dalili and resulted in profound economic, emotional, and dignitary harms to him and to his family members. Accordingly, Iran is subject to civil liability under 28 U.S.C. § 1605A for all damages authorized by Congress, including economic damages, pain and suffering, solatium, and punitive damages.

**COUNT I — PERSONAL AND ECONOMIC INJURIES CAUSED BY TORTURE AND HOSTAGE-TAKING UNDER 28 U.S.C. § 1605A(c)**

**(Plaintiff Shahab Dalili)**

43. Plaintiff, Shahab Dalili, realleges and incorporates by reference paragraphs 1–42 as if fully set forth herein.

44. At all relevant times, Defendant Islamic Republic of Iran was designated as a state sponsor of terrorism and acted through its officials, employees, agents, ministries, and instrumentalities, including its intelligence services, prison authorities, interrogators, and judicial officials, all acting under color of foreign law and within the scope of their authority.

45. While in Iran's custody and control, Mr. Dalili was intentionally subjected to acts of torture and hostage-taking within the meaning of 28 U.S.C. § 1605A. These acts included his arbitrary arrest, prolonged enforced disappearance and incommunicado detention, severe physical and psychological abuse, denial of due process and counsel of choice, coercive interrogations, and unlawful detention used to compel the United States.

46. Iran's conduct was intentional, malicious, and undertaken as a matter of official state policy, rendering Iran directly and vicariously liable pursuant to 28 U.S.C. § 1605A(c)(4).

47. As a direct and proximate result of Iran's conduct, Mr. Dalili endured extreme physical pain and suffering, psychological terror, mental anguish, degradation, humiliation, and the complete loss of his liberty for more than ten years. Throughout his imprisonment, he was subjected to hunger, inadequate nutrition, and inhumane and unsanitary living conditions. He was routinely deprived of basic necessities and personal hygiene, including regular access to bathing and adequate sanitary facilities. He was also isolated from his loved ones and denied

meaningful and consistent contact with his family, compounding his fear, anguish, and sense of abandonment. These conditions inflicted severe and cumulative physical and psychological harm. Mr. Dalili's suffering began at the moment of his arrest and continued, without interruption, until his release.

48. Mr. Dalili has suffered compensable personal-injury damages, including pain and suffering, mental anguish, and loss of liberty, all of which are recoverable under 28 U.S.C. § 1605A(c) and (d).

49. As a further direct and proximate result of Iran's acts, Mr. Dalili has suffered substantial economic damages. During his more than ten years of unlawful detention, he was deprived of the ability to work, earn wages, pursue professional and business opportunities, accumulate savings, and obtain employment-related compensation and benefits. He also lost the economic value of the household services, care, support, contributions, and other benefits he would have provided to his family but for his unlawful detention and torture. His prolonged absence further impaired his earning capacity, professional prospects, and ability to rebuild his financial life following his release. Mr. Dalili is therefore entitled to recover his lost past earnings, lost benefits, diminished earning capacity, the value of lost services and contributions, and all other reasonably foreseeable economic losses recoverable under 28 U.S.C. § 1605A(c) and (d).

50. Mr. Dalili further seeks punitive damages pursuant to 28 U.S.C. § 1605A(c), based on Iran's willful, wanton, and egregious conduct, to punish Iran for its deliberate use of torture and hostage-taking as instruments of state policy and to deter similar conduct in the future.

## COUNT II–IV — SOLATIUM, EMOTIONAL DISTRESS, AND RELATED DAMAGES CAUSED BY TORTURE AND HOSTAGE-TAKING UNDER 28 U.S.C. § 1605A(c)

**(Individual Plaintiffs - Nahid Khazai, Darian Dalili, and Damon Dalili)**

51. Plaintiffs Nahid Khazai, Darian Dalili, and Damon Dalili reallege and incorporate by reference paragraphs 1–42 as if fully set forth herein.

52. As a direct and proximate result of the Islamic Republic of Iran's acts of arbitrary arrest, enforced disappearance, prolonged torture, and hostage-taking of Shahab Dalili, the individual Plaintiffs—his spouse and children—have suffered severe and enduring emotional, psychological, and dignitary harm.

53. For more than ten years, the individual Plaintiffs were deprived of Mr. Dalili's presence, care, affection, support, guidance, companionship, and participation in the daily life of their family. Throughout that period, they lived with persistent fear and uncertainty concerning his safety, health, and survival, intensified by Iran's secrecy, its denial of any meaningful lawful process, and their inability to protect or assist him. They were forced to assume his responsibilities and manage family, household, financial, and personal affairs without him, while enduring significant family events and milestones in his absence. Their contact with Mr. Dalili was confined to limited, monitored, and irregular communications that afforded neither privacy nor meaningful reassurance and could be restricted or withdrawn at any time. This prolonged and involuntary separation caused the individual Plaintiffs profound grief, anxiety, helplessness, and psychological trauma, as well as the loss of Mr. Dalili's companionship, society, comfort, guidance, and support.

54. Iran's conduct was intentional, malicious, and calculated to maximize suffering not only to Mr. Dalili but also to his family, by exploiting their emotional bonds as a means of coercion and political leverage. The harms suffered by the individual Plaintiffs constitute

solatium, emotional distress, and related damages expressly recoverable under 28 U.S.C. § 1605A(c).

55. As a result, the individual Plaintiffs are entitled to recover solatium damages and all other non-economic damages authorized by 28 U.S.C. § 1605A(c), together with punitive damages to punish and deter Iran's egregious and unlawful conduct.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant, the Islamic Republic of Iran, and award the following relief:

(A) That judgment be entered in favor of Plaintiff, Shahab Dalili, and against Defendant for all damages recoverable under 28 U.S.C. § 1605A(c) and (d), including compensatory and punitive damages for personal injury, past and future lost earnings and earning capacity, economic loss, pain and suffering, emotional distress, and mental anguish, and all other consequential and reasonably foreseeable damages caused by Iran's acts of torture and hostage-taking.

(B) That judgment be entered in favor of the individual Plaintiffs, Nahid Khazai, Darian Dalili, and Damon Dalili, and against Defendant for solatium damages and all other non-economic damages authorized under 28 U.S.C. § 1605A(c), including compensation for emotional distress, grief, mental anguish, loss of companionship, loss of society, loss of guidance, and the severe psychological harm resulting from Iran's conduct.

(C) That punitive damages be awarded against Defendant pursuant to 28 U.S.C. § 1605A(c) in an amount sufficient to punish Iran for its intentional, malicious, and egregious

conduct and to deter Iran and other state sponsors of terrorism from engaging in similar acts in the future.

(D) That Plaintiffs be awarded all additional damages authorized by 28 U.S.C. § 1605A(d), including all reasonably foreseeable property loss, whether insured or uninsured, third-party liability, and loss claims arising from the same acts forming the basis of this action.

(E) That Plaintiffs be awarded pre-judgment interest, post-judgment interest, costs of suit, attorney's fees, and such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,

/s/Dylan G. Barket, Esq.
Florida Bar Number: 1026381
D.C. District ID: FL00128

**BARKET LAWYERS**
CONCORDE BUILDING - 7TH FLOOR
66 W. FLAGLER STREET
MIAMI, FL, 33130
TELE: (305) 373-6711
DYLAN@BARKETLAWYERS.COM
PLEADINGS@BARKETLAWYERS.COM